**Not for Publication**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

UNITED STATES OF AMERICA,

        *Plaintiff*,

   v.

SHAKA BLAKE,

        *Defendant*.

Crim. No. 19-587

**OPINION**

**John Michael Vazquez, U.S.D.J.**

     This matter comes before the Court by way of Defendant Shaka Blake's motion to modify his sentence and for immediate compassionate release. D.E. 50. Blake filed his original motion *pro se*, but counsel thereafter filed a supplemental motion on his behalf. D.E. 55. The Government filed opposition to both submissions. D.E. 52, 56. Defendant also made an additional *pro se* submissions in support of his request. D.E. 54, 57. The Court reviewed the parties' submissions[1] and considered the motion without oral argument pursuant to Local Criminal Rule 1.1 and Local Civil Rule 78.1(b). Defendant seeks immediate release due to the ongoing COVID-19 pandemic. Alternately, Blake seeks a 2:1 credit for each day he has spent in the Essex County Correctional Facility ("ECCF"). For the following reasons, Defendant's motion is denied.

---

[1] Defendant's *pro se* brief in support of his motion is referred to as "Br." (D.E. 50); Defendant's supplemental brief is referred to as "Supp. Br." (D.E. 55); Defendant's supplemental submission is referred to as "Supp. Ltr." (D.E. 54); Defendant's second supplemental submission is referred to as "2Supp. Ltr." (D.E. 57); the Government's opposition brief is referred to as "Opp." (D.E. 52); and the Government's opposition to Defendant's supplemental brief is referred to as "Supp. Opp." (D.E. 56).

I. **BACKGROUND**

A. **Underlying Criminal Proceeding**

On July 27, 2018, Blake was charged in a Complaint with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  D.E. 1.  He was then indicted on the same charge on August 23, 2019.  D.E. 24.  Because he was considered a danger to the community and a flight risk, Blake was denied bail on October 12, 2018.  D.E. 13.  Blake was remanded to ECCF.  On February 25, 2019 and on February 3, 3020, Blake was again denied bail.  D.E. 21, 32.  On April 9, 2020, Blake sought bail based on medical issues, D.E. 38, although subsequent medical records did not bear out his claim of asthma.  A bond hearing on May 8, 2020 was then continued to permit Blake additional time to secure medical records.  D.E. 41.  Blake's complete medical records from ECCF have now been produced to both parties.

Blake then pled guilty, without an agreement with the Government, on February 13, 2020.  D.E. 35.  At his sentencing, Blake sought a variance for, among other things, conditions at ECCF during the pandemic.  The Court denied the variance request, primarily based on Blake's lengthy criminal history.  Despite being only thirty-two at the time of sentencing, Blake's United States Sentencing Guidelines Criminal History Category was VI, based on numerous prior convictions for drugs, resisting arrest, theft, and aggravated assault.  On June 22, 2020, the Court sentenced Blake to seventy-seven months imprisonment (the bottom of the applicable Guidelines' range) followed by three years of supervised release.  D.E. 47, 48.  Due to the ongoing pandemic, the Federal Bureau of Prisons ("BOP") had not transferred Blake to one of their facilities as of October 2020; he remains in ECCF.

### B. COVID-19 Pandemic

COVID-19 "is caused by the virus severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), a new virus in humans causing respiratory illness which can be spread from person-to-person." *Coronavirus Disease 2019 (COVID-19)*, "COVID-19 Overview and Infection Prevention and Control Priorities in non-US Healthcare Settings," Centers for Disease Control and Prevention (Aug. 12, 2020), https://www.cdc.gov/coronavirus/2019-ncov/hcp/non-us-settings/ overview/index.html#background. "COVID-19 is primarily transmitted from person-to-person through respiratory droplets. These droplets are released when someone with COVID-19 sneezes, coughs, or talks." *Id.* Persons who contract the virus reflect a wide range of symptoms from asymptomatic to mild (including fever, cough, nausea, chest pain, and body pain) to severe to critical (including respiratory failure and death). *Id.* Currently, there is no known cure for COVID-19. As a result, standard precautions to prevent the spread of the virus include social distancing, proper hygiene, personal protective equipment (including use of a face mask), and maintenance of clean surfaces and devices. *Id.*

Numerous factors can increase a person's risk of severe illness if he/she contracts the virus. As a person get older, his/her risk for severe illness from COVID-19 increases. *Coronavirus Disease 2019 (COVID-19)*, "Older Adults," Centers for Disease Control and Prevention (Sept. 11, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html. For example, persons in their sixties and seventies are at a higher risk than people in their fifties. *Id.* Those eighty-five or older are at greatest risk. *Id.*

The following medical conditions put a person at increased risk of severe illness from COVID-19: cancer, chronic kidney diseases, chronic obstructive pulmonary diseases, heart conditions such as coronary artery disease, weakened immune system from organ transplant,

obesity, pregnancy, sickle cell disease, smoking, and type 2 diabetes mellitus. *Coronavirus Disease 2019 (COVID-19)*, "People with Certain Medical Conditions," Centers for Disease Control and Prevention (Nov. 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html. Persons who have the following medical conditions might be at an increased risk: asthma, cerebrovascular disease, cystic fibrosis, hypertension, immunocompromised state, neurologic conditions, liver diseases, pulmonary fibrosis, thalassemia, type 1 diabetes mellitus. *Id.*

Finally, racial and ethnic minorities may also be at an increased risk due to societal inequities, such as access to health care and poorer living conditions. *Coronavirus Disease 2019 (COVID-19)*, "Health Equity Considerations and Racial and Ethnic Minority Groups," Centers for Disease Control and Prevention (July 24, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity/race-ethnicity.html. Factors to be considered are discrimination; healthcare access and utilization; occupation; educational, income, and wealth gaps; and housing. *Id.*

As of November 11, 2020, the United States had 10,170,846 COVID-19 cases, which resulted in 239,590 deaths. *CDC COVID Data Tracker*, "United States COVID-19 Cases and Deaths by State," https://covid.cdc.gov/covid-data-tracker/#cases_casesper100klast7days (last visited Nov. 11, 2020).

1. **ECCF**

Alfaro Ortiz, the Director of ECCF, submitted a declaration in this matter, in which he details ECCF's efforts to combat the virus. D.E. 56-1. Each inmate is screened before admission and each has his/her temperature taken. *Id.* ¶ 11. Health care is administered by CFG Health Systems under the supervision of Dr. Lionel Anicette, M.D., the on-site physician. *Id.* ¶ 12. Due to the pandemic, ECCF now offers "24/7" medical coverage on-site and has a 42-bed infirmary. *Id.* The medical staff is comprised of doctors, RNs, LPNs, nurse practitioners, and physician assistants; two RNs and LPNs are always on-site. *Id.* ¶ 13. A physician is at the facility 16 hours a day, 7 days a week, and one is always on call for emergencies. *Id.* A nurse visits each housing twice a day to determine if any inmates have health problems. *Id.* ¶ 14.

Since the onset of the pandemic, ECCF has also taken the following steps, among others: (1) educated staff on protocols and best practices to prevent the spread of COVID-19; (2) educated inmates on the importance of hygiene, social distancing, and other preventative measures; (3) established a new protocol for inmates who could be at a higher risk for a severe outcome if the inmate contracts COVID-19; (4) increased monitoring of all inmates for signs and symptoms of the virus; (5) established a quarantine area; (6) hired more staff for additional cleaning and sanitizing of the facility; (7) initiated health screening for all staff and other persons who enter the facility; and (8) posted health information throughout the facility as to best practices to combat COVID-19. *Id.* ¶ 19. ECCF also quarantines all new inmates for 14 days. *Id.* ¶ 20. The facility further conducts COVID-19 antibody testing on all new inmates. *Id.* ECCF has also taken measures to ensure inmates are better able to socially distance and to prevent the number of persons who enter the facility. Finally, ECCF has increased its supply of soap, surgical masks, N95 masks, face shields, sanitizer, and disinfectant. *Id.* ¶ 25.

If an inmate demonstrates moderate to severe symptoms of the virus, he/she is taken to University Hospital. *Id.* ¶ 29. Those inmates who are infected, but who do not require hospitalization, are isolated from other inmates. *Id.* ¶ 30. If an inmate has suffered potential exposure to COVID-19 but is asymptomatic, the inmate is housed with other similarly-situated inmates; this process is known as "co-horting." *Id.* ¶ 33.

ECCF's COVID-19 statistics are as follows: 8 civil immigration detainees (with no new cases in the past 15 weeks); 21 county inmates (with no new cases in the past 9 weeks); 97 members of the correctional staff (95 have been cleared to return to work and no new cases in the past 5 weeks); and 4 civilian staff (with no new cases since the week of May 11, 2020). *Id.* ¶ 44.

### 2. New Jersey

New Jersey has been particularly hard hit by the pandemic. New Jersey has taken numerous affirmative steps, such as the Governor's stay-at-home order issued on March 21, 2020, to combat the virus. In addition, New Jersey initially closed schools indefinitely and closed beaches, state parks, and county parks. When the number of New Jersey cases started to decline, many of the initial restrictions were lifted or relaxed. However, New Jersey is now facing another uptick in positive cases, and the Governor recently issued new mitigation orders. *Governor Murphy Announces New COVID-19 Mitigation Measures*, New Jersey COVID Information Hub (Nov. 11, 2020), https://covid19.nj.gov/faqs/announcements/all-announcements/governor-murphy-announces-new-covid-19-mitigation-measures. As of November 11, 2020, New Jersey has 263,495 cases and a resulting 14,676 deaths. *Data Dashboard*, New Jersey COVID Information Hub (Nov. 12, 2020), https://covid19.nj.gov. Essex County, where Defendant indicates he would live if released, has had 30,780 cases with 1,955 deaths, including 355 new cases on November 17, 2020. *Id.*

### C. Blake's Other Relevant Background, Activities, and Conditions

Blake indicates that he has been in lockdown 18 hours per day since March 2020 and that he contracted COVID-19, which "caused a chain reaction that infected several inmates and unfortunately some have died." Br. at 2. He adds that he has not been given proper supplies. *Id.* Blake's medical records show that he has been treated for high blood pressure, and a May 19, 2020 test showed the presence of IgG antibodies (but negative for IgM antibodies). Blake has also been treated for anxiety and depression. Blake previously claimed that he suffered from asthma. However, Blake's medical records do not reflect a history of asthma; instead the records indicate that Blake asked that his records indicate asthma – a request he made on April 16, 2020 (approximately a week after Blake represented to the Court that he had asthma in connection with a bail application).[2] In addition, Blake's over 400 pages of medical records demonstrate that he regularly seeks medical attention and that medical attention is always provided.

Blake further indicates that he is, or intends to be, a member of a class action lawsuit (presumably against ECCF). Supp. Ltr. at 6-11. Blake signed a document indicating that for three days in August 2020 (the 12th, 13th, 17th), his unit was improperly placed on lockdown. *Id.* at 7.

The Government contested Blake's initial *pro se* motion because Blake had not exhausted his administrative remedies by first seeking release from the BOP. Blake then followed with a letter to the Director of the BOP, Supp. Ltr. at 4; the Government is no longer arguing that Blake has failed to exhaust his remedies.

## II.   LEGAL STANDARD

Following the passage of the First Step Act, Section 3582(c)(1)(A) now reads as follows:

---

[2] In his most recent submission, Blake claims to have been provided an "asthma pump." 2Supp. Ltr. At 2.

>  (c) Modification of an imposed term of imprisonment. The court may not modify a term of imprisonment once it has been imposed except that—
>
>  (1) in any case—
>
>  (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
>  (i) *extraordinary and compelling reasons warrant such a reduction*; or
>
>  (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and *a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g)*;
>
>  *and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission*; and
>
>  (B) the court may modify an imposed term of imprisonment to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure; and
>
>  (2) in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. 994(o), upon motion of the defendant or the Director of the Bureau of Prisons, or on its own motion, the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A) (emphases added). The parties agree that Defendant has satisfied the statutory exhaustion requirement. Opp. at 4.

The applicable policy statement of the United States Sentencing Commission is found in Section 1B1.13.  U.S. Sentencing Guidelines Manual § 1B1.13 (U.S. Sentencing Comm'n 2018). The application notes to the section provide four circumstances that can be considered extraordinary and compelling:  (1) the medical condition of the defendant, (2) the age of the defendant, (3) family circumstances, and (4) other circumstances constituting an extraordinary or compelling reason, either considered alone or in combination with any of the other three stated reasons.  *Id.* cmt. n. 1(A)-(D).

In the application note, the fourth consideration requires a determination by the Director of the BOP.  *Id.* cmt. n. 1(D).  Here, the Government does not contest that the policy statement should also apply when the motion is filed by a defendant, in addition to a motion filed by the BOP Director.  The Court also finds that the policy statement applies here, although this has been a point of contention in similar cases.  In *United States v. Rodriguez*, 451 F. Supp. 3d 392 (E.D. Pa. 2020), United States District Judge Anita Brody confronted the same issue.  Ultimately, Judge Brody held that the fourth provision also applies when the motion is made by a defendant.  *Id.* at 400.  Judge Brody noted that her determination was in accord with the majority view.  *Id.* at 397 (collecting cases).  Judge Brody persuasively explained her decision as follows:

> Under the First Step Act, however, it is possible for inmates to file compassionate-release motions—under the 30-day lapse provision—when their warden *never* responds to their request for relief.  Thus, Congress specifically envisioned situations where inmates could file direct motions in cases where nobody in the BOP *ever* decided whether the motion qualified for relief under the catchall provision that the Commission originally sought to apply to *all* motions.
>
> It would be a strange remedy indeed if Congress provided that prisoners whose wardens failed to respond in such a situation could only take advantage of the thirty-day lapse provision by accepting a pared-down standard of review that omitted the flexible catchall standard. . . .  This would have the perverse effect of

9

> *penalizing* prisoners who take advantage of the First Step Act's fast-track procedures and rewarding prisoners who endure the BOP-related delay that the Act sought to alleviate.
>
> That would be antithetical to the First Step Act. The First Step Act—and the critical 30-day lapse route it provided—directly responded to a compassionate-release system so plagued by delay that prisoners sometimes died while waiting for the BOP to make a decision. *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice); *see also* 164 Cong. Rec. S7314-02, 2018 WL 6350790 (Dec. 5, 2018) (statement of Senator Cardin, co-sponsor of First Step Act) ("[T]he bill expands compassionate release . . . and expedites compassionate release applications."). . . .  Congress sought to help, not hinder, these sorts of prisoners . . . .  Nothing in the text of the old policy statement calls for it, since that statement expressly limits itself to motions filed by the BOP and was written before this situation was even possible to envision.
>
> Adopting the minority view, then, would undermine the purpose of the First Step Act and create an inconsistent and shifting definition of the term "extraordinary and compelling."  Because the Sentencing Commission has not issued a policy statement addressing post-First Step Act procedures, it certainly has not mandated that courts take such an approach.  Accordingly, as a result of the First Step Act, there is simply a procedural gap that the Sentencing Commission—currently lacking a quorum and unable to act—has not yet had the chance to fill.  Nothing in § 3852(c)(1)(A)(i) requires courts to sit on their hands in situations like these.  Rather, the statute's text directly instructs *courts* to "find that" extraordinary circumstances exist.

*Id.* at 399-400 (emphases in original).

Pursuant to Section 3582(c)(1)(A), the Court must also consider the factors listed in 18 U.S.C. § 3553(a).  They include the nature and circumstances of Defendant's offense, the history and characteristics of Defendant, the need for the sentence to provide just punishment, and the need to protect the public from future offenses of Defendant.  *Id.*

**III.     ANALYSIS**

The Court finds that Blake has not met his burden in demonstrating extraordinary and compelling reasons to justify his release. Blake's hypertension potentially makes him more at risk of suffering an adverse outcome should he contract the virus. Only this factor weighs in favor of his request. As to Blake's claim of asthma, the Court finds that he has not sufficiently established that he suffers from the ailment. Blake's voluminous medical records do not reflect a diagnosis of asthma, and he suspiciously requested that asthma be noted in his records a week after representing to the Court that he had asthma. Similarly, Blake has not established that he has been in lockdown 18 hours a day since March. Indeed, this claim is undercut by his class action lawsuit, which indicates a lockdown only on three specific days in August. As to Blake's claim that he had COVID-19, which led to numerous additional infections and death, the record does not bear him out. The record reflects that Blake had a positive test for IgG, which means that he may have been, or probably was, exposed to the virus.

Moreover, ECCF has taken substantial steps to combat the virus. Those efforts are set forth above, but they include additional medical training, additional medical staffing, educational materials, additional cleaning, and a greater supply of necessary items, such as masks, soap, disinfectant, and hand sanitizer. ECCF medically screens new inmates and has protocols in place to isolate and monitor inmates who are asymptomatic and treat those who have more severe symptoms. ECCF has also taken affirmative steps to ensure that inmates are better able to socially distance. Critically, ECCF's efforts have appeared to bear fruit. While ECCF has had numerous cases in the past, it has not had any new cases for several weeks. As to Blake personally, he has often sought medical attention while at ECCF (both before and after the pandemic), and ECCF's staff have always been responsive to his medical complaints.

In addition, Blake was recently sentenced by the Court, so the Court's Section 3553(a) analysis from that proceeding is still applicable. Blake has not pointed to any new information that would change the Court's review. And the Court denied Blake's request for a variance due to his extensive criminal record.

Finally, Blake has only served approximately 50% of his sentence, which militates against his request. *United States v. Pawlowski*, 967 F.3d 327, 330-31 (3d Cir. 2020) (ruling that in deciding a motion for compassionate release, a district court may consider the amount of time remaining on a defendant's sentence).

For the foregoing reasons, the Court denies Blake's motion.

## IV.     CONCLUSION

For the foregoing reasons, the Court denies Defendant's motion. An appropriate Order accompanies this Opinion.

Dated:  November 18, 2020

                                                                                            _____
                                                                                            John Michael Vazquez, U.S.D.J.